1  Philip J. Layfield
   c/o Maximum Legal Holdings, LLC
2  8 The Green
   Suite 6426
3  Dover, Delaware 19901
   Telephone: (302) 401-6804
4  phil@maximum.global

5

6              **UNITED STATES BANKRUPTCY COURT**

7          **FOR THE MIDDLE DISTRICT OF TENNESSEE**

8                    **NASHVILLE DIVISION**

9

| | |
|---|---|
| 10  Wellgen Standard, LLC, | Case No.: 3:18-cv-00275 |
| 11      Plaintiff | |
| | Assigned to: Hon. William L. Campbell, Jr. |
| 12      vs. | |
| 13  Maximum Legal Holdings, LLC, Maximum | **ANSWER, COUNTER-CLAIM, AND CROSS-** |
|     Legal, LLC, Maximum Legal Services, LLC, | **CLAIM** |
| 14  Maximum Legal Staffing, LLC, Maximum | |
|     Legal (Florida), PLLC, Maximum Legal | |
| 15  (Utah), LLC, Maximum Legal (Arizona), | |
|     LLC, Joseph Martin Barrett and Todd | |
| 16  Wakefield | |
| 17      Defendants | |

18  Philip Layfield, an individual

19      Counterclaim Plaintiff,

20      vs.

21  Wellgen Standard, LLC,

22      Counterclaim Defendant

23  Philip Layfield, an individual

24      Cross-claim Plaintiff,

25      vs.

26  Advocate Capital, Inc., a Tennessee
    corporation, Todd Wakefield, an individual,
27  Joseph M. Barrett, an individual, and
    Gregory Allen Stuck, an individual,
28  Christopher Tyler Webster, an individual,
    Jeffery Golden, an individual, Martin J. Brill,

| | |
|---|---|
| 1 | an individual, Richard Horner, an individual, and John Does 1-50, inclusive, |
| 2 | Cross-Claim Defendants. |

**DEFENDANT PHILIP LAYFIELD AS SUCCESSOR-IN-INTEREST TO MAXIMUM LEGAL HOLINGS, LLC AND MAXIMUM LEGAL SERVICES, LLC HEREBY RESPONDS TO PLAINTIFFS' COMPLAINT. THIS ANSWER, COUNTERCLAIM AND CROSS-CLAIM IS FILED ON BEHALF OF PHILIP LAYFIELD IN HIS INDIVIDUAL CAPACITY AS WELL AS ON BEHALF OF MAXIMUM LEGAL HOLDINGS, LLC AND MAXIMUM LEGAL SERVICES, LLC AS THE SUCCESSOR-IN-INTEREST.**

Layfield alleges for his Answer as to the Complaint by Wellgen as follows:

## I.      PARTIES

1. The allegations of paragraph 1 constitute legal conclusions and therefore do not require a response.

2. The allegations of paragraph 2 constitute legal conclusions and therefore do not require a response.

3. The allegations of paragraph 3 constitute legal conclusions and therefore do not require a response.

4. The allegations of paragraph 4 constitute legal conclusions and therefore do not require a response.

5. The allegations of paragraph 5 constitute legal conclusions and therefore do not require a response.

6. The allegations of paragraph 6 constitute legal conclusions and therefore do not require a response.

7. The allegations of paragraph 7 constitute legal conclusions and therefore do not require a response.

1       8.  The allegations of paragraph 8 constitute legal conclusions and therefore do not require a

2 response.

3       9.  The allegations of paragraph 9 constitute legal conclusions and therefore do not require a

4 response.

5       10.  The allegations of paragraph 10 constitute legal conclusions and therefore do not

6 require a response.

7 ## II.  JURISDICTION AND VENUE

8

9       11.  The allegations of paragraph 11 constitute legal conclusions and therefore do not

10 require a response.

11

12       12.  The allegations of paragraph 12 constitute legal conclusions and therefore do not

13 require a response.

14       13.  The allegations of paragraph 13 constitute legal conclusions and therefore do not

require a response.

15       14.  The allegations of paragraph 14 constitute legal conclusions and therefore do not

16 require a response.

17       15.  The allegations of paragraph 15 constitute legal conclusions and therefore do not

18 require a response.

19 ## III.  FACTUAL BACKGROUND

20     16.  Admit

21     17.  Admit

22     18.  Admit

23     19. Admit

24     20.  Defendant is without sufficient knowledge or information to form a belief as to the

25 allegations contained in paragraph 20 and on that basis, denies this allegation.

26     21.  Defendant is without sufficient knowledge or information to form a belief as to the

27 allegations contained in paragraph 21 and on that basis, denies this allegation.

28     22.    Defendant is without sufficient knowledge or information to form a belief as to the

allegations contained in paragraph 22 and on that basis, denies this allegation.

23. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 23 and on that basis, denies this allegation.

24. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 24 and on that basis, denies this allegation.

25. The allegations of paragraph 25 constitute legal conclusions and therefore do not require a response.

26. The allegations of paragraph 26 constitute legal conclusions and therefore do not require a response.

27. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 27 and on that basis, denies this allegation.

28. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 28 and on that basis, denies this allegation.

29. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 29 and on that basis, denies this allegation.

30. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 30 and on that basis, denies this allegation.

31. Admit

32. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 32 and on that basis, denies this allegation.

33. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 33 and on that basis, denies this allegation.

34. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 34 and on that basis, denies this allegation.

35. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 35 and on that basis, denies this allegation.

36. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 36 and on that basis, denies this allegation.

37. Defendant is without sufficient knowledge or information to form a belief as to the

allegations contained in paragraph 37 and on that basis, denies this allegation.

38. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 38 and on that basis, denies this allegation.

39. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 39 and on that basis, denies this allegation.

40. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 40 and on that basis, denies this allegation.

41. Admit.

42. Admit.

43. Deny.

44. Admit.

45. Deny. Wellgen has the ability to seek relief from stay, but refuses to do so in order to sue defendants in an inconvenient forum. As a result, Wellgen should be disallowed from later claiming that venue in Los Angeles is proper for any later proceeding.

46. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 46 and on that basis, denies this allegation.

47. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 47 and on that basis, denies this allegation.

48. Deny.

49. Deny.

50. Deny.

51. Admit.

52. Admit.

53. Deny.

54. Deny.

55. Deny.

56. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 56 and on that basis, denies this allegation.

57. Deny.

58.  Admit unless Mr. Wakefield fraudulently claims that he is the 100% owner as he has previously done with respect to Maximum Legal (California), LLP.

59.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 59 and on that basis, denies this allegation.

60.  Admit unless Mr. Wakefield fraudulently claims that he is the 100% owner as he has previously done with respect to Maximum Legal (California), LLP.

61.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 61 and on that basis, denies this allegation.

62.  Admit unless Mr. Wakefield fraudulently claims that he is the 100% owner as he has previously done with respect to Maximum Legal (California), LLP.

63.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 63 and on that basis, denies this allegation.

64.  Deny.

65.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 65 and on that basis, denies this allegation.

66.  Admit to the extent Maximum Legal Services, LLC was active and not dissolved.

67.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 67 and on that basis, denies this allegation.

68.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 68 and on that basis, denies this allegation.

69.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 69 and on that basis, denies this allegation.

70.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 70 and on that basis, denies this allegation.

71.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 71 and on that basis, denies this allegation.

72.  Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 72 and on that basis, denies this allegation.

73.  Defendant is without sufficient knowledge or information to form a belief as to the

allegations contained in paragraph 73 and on that basis, denies this allegation.

74. Admit except to the extent the actions are alleged to have been taken pursuant to a fraudulent scheme, which they were not.

75. Deny.

76. Defendant admits that Wakefield and Barrett devised a fraudulent scheme to harm Advocate and Layfield, but it is not the fraudulent scheme as articulated in Wellgen's instant complaint.

77. Deny. This matter is subject to a separate lawsuit currently pending in the United States Bankruptcy Court for the Central District of California.

78. Deny.

79. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 79 and on that basis, denies this allegation.

80. Admit.

81. Admit.

82. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 82 and on that basis, denies this allegation.

83. Admit. Because of the actions taken by Barrett and Wakefield against L&B by falsely telling clients that Layfield had abandoned L&B, L&B's clients begin aggressively terminated any and all client relationships.

84. Admit.

85. Deny.

86. Admit.

87. Admit.

88. Admit.

89. Admit.

90. Deny. The case was converted on October 18, 2017.

91. Deny. Wellgen may seek relief from stay, but chooses not to and thus has failed to join an indispensable party.

92. Admit.

93. Deny. This judgment is void as a matter of law because Mr. Layfield was never served and thus the United States District Court never obtained personal jurisdiction over Mr. Layfield.

94. Deny. Because the judgment is void as a matter of law, it cannot be assigned.

## IV. **COUNT-1-BREACH OF CONTRACT**

### (Mr. Barrett and Mr. Wakefield)

95. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 95 and on that basis, denies this allegation.

96. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 96 and on that basis, denies this allegation.

97. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 97 and on that basis, denies this allegation.

98. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 98 and on that basis, denies this allegation.

## V. **COUNT II-BREACH OF CONTRACT**

### (Maximum Legal Entities)

99. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 99 and on that basis, denies this allegation.

100. Defendant is without sufficient knowledge or information to form a belief as to the allegations contained in paragraph 100 and on that basis, denies this allegation.

101. Deny.

102. Deny.

### SEPARATE AFFIRMATIVE DEFENSES

### AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

103. Defendant alleges that the Complaint fails to state facts sufficient to constitute a cause of action against the Defendant.

### AFFIRMATIVE DEFENSE

### (Denial of Damages)

104. Defendant denies that Plaintiff has been damaged in any sum or sums, or otherwise, or

1    at all, by reason of any act or omission by Defendant.

2                        **AFFIRMATIVE DEFENSE**

3                          **(Good Faith Immunity)**

4        105. Defendant pleads that he acted without malice and with good faith at all relevant times

5    and therefore enjoys good faith immunity from suit.

6                        **AFFIRMATIVE DEFENSE**

7                          **(Statute of Limitations)**

8        106. The Complaint and each cause of action therein is barred by the applicable statutes of

9    limitation.

10                       **AFFIRMATIVE DEFENSE**

11                         **(Reckless and Wanton)**

12       107. Defendant alleges that at all time mentioned in the Complaint, Plaintiff acted in a

13   careless, reckless, wanton and negligent manner in our about the matters set forth in the Complain,

14   that such careless, reckless, wanton and negligent conduct proximately contributed to the injuries

15   and damages, if any, sustained or claimed by Plaintiff, that as a consequence, Plaintiff's claims are

16   barred.  The reckless conduct, includes but is not limited to the failure of Plaintiff to ensure that

17   L&B had adequate funding, failure to insist on a budget before for the L&B trustee before insisting

18   the trustee liquidate L&B, the failure of Plaintiff to diligently refer out cases valued in the millions

19   of dollars and thus be able to satisfy its' own creditors and Plaintiff's waste of resources, thus

     forcing L&B and MLC it to liquidate rather than reorganize.

20                       **AFFIRMATIVE DEFENSE**

21                          **(Negligence)**

22       108. Defendant alleges Plaintiff's claims are barrred because Plaintiff failed to exercise

23   reasonable and ordinary care, caution, or prudence in handling its affairs in relation to the L&B

24   account both prior to and upon ceding complete control of L&B to Pachulski. Any damages

25   alleged (the existence of which damage Defendants deny) were proximately caused and contributed

26   to by Plaintiff's own negligence, or by some other third party over whom Defendants exercised no

27   control, including Todd Wakefield, Joseph Barrett, Mark Aveis, Mark Speidel, Juan Dominguez,

28   Jeffrey Golden, Advocate Capital, and others.

**AFFIRMATIVE DEFENSE**

**(Consent)**

109. Plaintiff acknowledged, ratified, consented to, and/or acquiesced in the alleged acts or omissions, if any, of this Defendant, thus, barring Plaintiff's recovery.

**AFFIRMATIVE DEFENSE**

**(Failure to Mitigate)**

110. Plaintiff failed to take reasonable efforts to mitigate their alleged damages, if any, and recover should not be allowed for damages, if any, that Plaintiff should have foreseen and could have avoided by reasonable effort. This lawsuit is nothing more than a sham.

**AFFIRMATIVE DEFENSE**

**(Proximate Cause Lacking)**

111. Defendant's alleged acts or omissions, if any, were not the proximate cause of any injury suffered by Plaintiff.

**AFFIRMATIVE DEFENSE**

**(Estoppel)**

112. Plaintiff's claims are barred by the defense of equitable estoppel.

**AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

113. Plaintiff's claims are barred by the doctrine of unclean hands.

**AFFIRMATIVE DEFENSE**

**(Laches)**

114. Defendant alleges Plaintiff's claims are barred by the doctrine of laches.

**AFFIRMATIVE DEFENSE**

**(In Pari Delicto)**

115. Defendant alleges Plaintiff's claims are barred by the doctrine of in pari delicto

**AFFIRMATIVE DEFENSE**

**(Ratification)**

116. Defendant alleges Plaintiff's claims are barred by the doctrine of ratification

**AFFIRMATIVE DEFENSE**

**(Set-Off)**

117. Defendant alleges Plaintiff's claims are barred or reduced by the doctrine of set-off.

**AFFIRMATIVE DEFENSE**

**(Consent and Approval)**

118. Defendant alleges Plaintiff's claims are barred because Plaintiff consented to and approved the acts and omissions as well as the subject transfers about which Plaintiff now complains.

**AFFIRMATIVE DEFENSE**

**(Reservation of Defenses)**

119. Defendant may have other separate and/or additional defenses of which he is not aware and hereby reserves the right to assert such defenses by amendment of this answer.

**<u>COUNTER-CLAIMS</u>**

Layfield alleges for his counterclaims against Wellgen as follows:

**I.    INTRODUCTION**

120. Wellgen is an alter-ego of Advocate Capital, Inc. ("Advocate"). Advocate and Wellgen share common ownership, office space and operations. On information and belief Advocate and Wellgen even share computer networks.

121. During 2017, Wellgen and Advocate became aware that Layfield & Barrett ("L&B") was experiencing cash flow shortages. L&B repeatedly requested Advocate to increase its borrowing capacity and on multiple occasions, Advocate refused.

122. During the summer of 2017, Wellgen and Advocate become aware that L&B had referred numerous cases to Maximum Legal, LLC ("ML") and its affiliated entities. These referral arrangements were of a standard form and were within the standard rates often paid to third-parties. Both Advocate and Wellgen were aware that L&B frequently referred cases to third-party firms as

well as third-party firms referring cases to L&B.

123. In connection with the establishment of ML, ML agreed to pay arm's length referral fees back to L&B in connection with cases being referred to ML by L&B.

124. At the time of the referral arrangement, L&B had detailed financial projections showing that current assets, which included accounts receivable, work-in-progress and liens on cases that former L&B employees and/or other law firms had stolen from L&B would be sufficient to satisfy L&B's creditors, which included Advocate, Wellgen, clients and other lienholders.

125. Had L&B not been forced into bankruptcy by one of its competitors, and with the assistance of Wakefield and Barrett, L&B would have and could have satisfied all of its obligations.

126. Unbeknownst to Layfield, Barrett and Wakefield had devised a scheme to allege that Layfield had abandoned L&B, stole millions of dollars and fled to Costa Rica with millions of dollars in stolen client funds. Barrett and Wakefield knew those allegations were false at the time they made them and were solely designed to cause clients, attorneys and others to defect from L&B and fall into the hands of Maximum Legal (California), LLP.

127. Because Maximum Legal (California), LLP ("MLC") was established for the sole purpose of handling the California based cases for the ML structure, it was not initially apparent that Wakefield and Barrett were attempting to steal all of the former L&B cases from ML, the assets of ML and the employees of ML.

128. Until Wakefield fraudulently filed a bankruptcy petition in July 2017 on behalf of Maximum Legal (California), LLP claiming that he was the 100% owner of MLC, Layfield was unaware of the scheme as devised by Wakefield and Barrett.

129. The scheme operated as follows: a. Wakefield and Barrett would allege that Layfield fled the country with millions of dollars in stolen client funds; b. Wakefield and Barrett would file claim that Wakefield was the 100% owner of MLC despite knowing that Wakefield had agreed in connection with his former position as General Counsel of L&B that he would only be a nominee partner with .01% ownership with the remaining 99.99% owned by ML; c. Wakefield and Barrett would file a fictitious business name statement to establish Barrett Law as a d/b/a of MLC; d. Wakefield and Barrett would make false criminal allegations against Layfield in order to force the involuntary closure of L&B either through a state bar proceeding or involuntary bankruptcy; e.

upon forcing the involuntary closure of L&B, Wakefield and Barrett would cause all former lucrative L&B clients to sign new engagements with MLC; f. by claiming that Layfield was engaged in criminal activity, Barrett & Wakefield could avoid paying referral fees or lien claims to L&B, thus obtaining millions of dollars in lucrative fees with no attached expenses; g. file a chapter 11 bankruptcy, despite not having appropriate corporate authority and use that process to avoid debts and further enrich themselves.

130. Ultimately, the scheme as devised by Wakefield and Barrett failed because despite receiving over $500,000 from a former L&B client, Advocate placed a lien on those funds and notified MLC of its intent to further lien all monies received by MLC. This action by Advocate thwarted Wakefield and Barrett's scheme, but left MLC, its client (who were former L&B clients) and L&B is disarray.

131. At the same time Advocate/Wellgen were causing MLC to implode on itself, Advocate/Wellgen became increasingly aggressive with L&B. Despite having a workable plan to pay off the entire debt owed from L&B, Advocate/Wellgen refused to cooperate with L&B to pay down its debts. Rather, Advocate took the most aggressive and reckless stance possible and caused a Trustee to become appointed over L&B. Prior to the appointment of the Trustee, Advocate failed to demand a budget, plan or operational guidance. Within days of the Trustee being appointed for L&B, the Trustee fired all L&B clients, compromised L&B's claims to attorney fees against those fired clients and dismantled the entire L&B operation in what can only be described as a complete evisceration of the law firm.

132. Advocate and Wellgen mistakenly thought they could recover the majority of their advances to L&B by attempting to enforce a guarantee against Layfield.

133. Advocate sued Layfield under the guarantee in United States District Court in the Central District of California ("USDCCA").

134. Advocate never personally served Layfield with the lawsuit and thus the USDCCA never obtained jurisdiction over Layfield.

135. Advocate/Wellgen, its principals and its lawyers all knew that Layfield was in Costa Rica for the entire month of September 2017. Despite this knowledge, they caused a process server to sign under penalty of perjury that Layfield had been personally served in Marina del Rey,

California. Advocate/Wellgen, its principals and its lawyers then further suborned perjury by causing a series of documents to be filed in the USDCCA under penalty of perjury in order to obtain a default judgment against Layfield.

136. Because Layfield was never served as fraudulently alleged by Advocate/Wellgen, the judgment is void as a matter of law.

137. After Wakefield and Barrett's scheme was thwarted by Advocate/Wellgen, Barrett attempted to shift gears by disclaiming any involvement with MLC. Barrett has gone so far as to claim that during the summer of 2017 he was working on his own behalf rather than on behalf of MLC and thus is entitled to attorney fees in his personal capacity for the work he performed on behalf of L&B and MLC.

138. Since September of 2017, both Wakefield and Barrett have failed to cooperate with the MLC bankruptcy they filed, have refused to attend the 341 meeting of creditors and have refused to provide any information to the MLC Trustee.

139. In furtherance of their scheme, Wakefield illegally entered the office of L&B and destroyed computer data and deleted files. Barrett similarly has made false reports to law enforcement, filed false claims in connection with the MLC bankruptcy and Wakefield has filed fraudulent declarations under penalty of perjury in various courts throughout the United States.

140. Both Barrett and Wakefield have secretly collected large fees on cases formerly handled by L&B and MLC. Those fees should be used to pay former L&B client claims and other creditors.

141. Despite having had other clients who defaulted on their obligation, other clients subject to State Bar disciplinary procedures, Advocate/Wellgen chose scorched earth and fraudulent tactics to collect against Layfield and others. Those tactics ultimately backfired and accelerated and exacerbated the losses.

## First Counterclaim- Fraud

### (Against Wellgen)

142. Layfield incorporates by reference each of the foregoing allegations as though fully set forth herein.

143. Wellgen and Advocate, by and through their agent Jeffrey Golden, made representations to the District Court that they knew were false, or had no reasonable basis for believing to be true, and/or Wellgen and Advocate made the representations recklessly, without regard for their truth.

144. Wellgen and Advocate, by and through their agent and by and through their principals made false representations with the intent that Defendants and others, including the District Court would rely on the representations, and with the intent to thereby defraud Layfield, by: (a) inducing the District Court to endorse and approve a default judgment against Layfield, (b) utilize the existence of a default judgment against Layfield to force Layfield into an Involuntary Bankruptcy, (c) use the Involuntary Bankruptcy as a means and method to prevent Layfield from exposing the criminal conduct of Wellgen and their agents, (d) and attempt to use the existence of a void judgment to inflict further harm on Layfield.

145. During the course of negotiating a payoff of the underlying loan, Wellgen and Advocate claimed to be working with Layfield in good faith to structure a loan payoff in August of 2017. The truth was that Wellgen and Advocate never planned on pursuing a structure to satisfy the loan. In fact, Wellgen and Advocate were planning the entire time to force L&B out of business, strip Layfield of his ownership in L&B and ML and attempt to seize all of Layfield's assets.

146. After L&B's bankruptcy was converted into a debtor-in-possession, Advocate and Wellgen led L&B's attorneys to believe that if L&B consented to the appointment of a Trustee, that Wellgen and Advocate would pursue a reorganization of L&B in order to maximize the assets of the L&B estate. Instead, Wellgen and Advocate never intended to pursue a reorganization. In fact, Wellgen and Advocate secretly concealed their true intention, which was to immediately cease operations and liquidate. Wellgen and Advocate knew that L&B's lawyers would relay the information regarding the potential for a reorganization as opposed to a liquidation of L&B and that Layfield would rely on that information.

146. Layfield reasonably relied upon the representations of Wellgen, Advocate and their agents in generally approving the appointment of a Trustee. However, the lawyer for L&B failed to seek written approval of certain conditions of the reorganization plan. Knowing that the L&B

lawyer failed to secure the appropriate conditions, Advocate and Wellgen lured that lawyer into signing a consent under false pretenses. Immediately upon obtaining the signature from L&B's attorney, which Layfield did not expressly authorize, Wellgen and Advocate forced the firing of all L&B clients and allowed all collateral to evaporate into thin air.

147. As a proximate result of the reliance on these false representations, Layfield has been injured.

148. Layfield's reliance and others reliance on the false representations of Advocate, Wellgen and their agents was a substantial factor in causing Layfield harm.

149. Wellgen and Advocate's conduct described herein was intended to cause injury to Layfield and intended to deprive him of money and property he was entitled to retain, or was despicable conduct carried on by Wellgen and Advocate with a willful and conscious disregard for Layfield's rights. Wellgen and Advocate's conduct subjected Layfield to cruel and unjust hardship in conscious disregard of the rights of Layfield, and constituted intentional misrepresentation, deceit, or concealment of material facts known to Wellgen and Advocate with the intention to deprive Layfield of property and/or legal rights, or otherwise cause injury, so as to constitute malice, oppression, or fraud under California Civil Code section 3294, and thereby entitling Layfield to punitive damages in an amount to punish or set an example of Wellgen and Advocate as alter egos of each other.

## Second Counterclaim- Negligence

### (Against Wellgen)

150. Layfield incorporates by reference each of the foregoing allegations as though fully set forth herein.

151. Wellgen and their alter ego Advocate failed to exercise reasonable care in deciding to appoint a Chapter 11 Trustee without first obtaining a budget or understanding of how the Trustee intended to administer the L&B estate. Wellgen and Advocate also failed to develop a suitable plan to handle the referral of high value cases and to ensure that L&B's assets did not disappear into the hands of lawyers that never intended to honor L&B liens.

152. Wellgen and Advocate failed to exercise reasonable care in decided to abruptly liquidate the entire L&B business under the false pretense that Layfield criminally stole millions of

1  dollars and fled the country to avoid prosecution. These improper statements, which were known

2  to be false at the time they were made or should have easily been known to be false caused the

3  value of the L&B assets to virtually evaporate into thin air.

4       153. The actions and inactions of Wellgen and Advocate were a substantial factor in

5  causing Layfield's harm.

6       154. As a direct and proximate result of the acts and omissions of Wellgen and Advocate,

7  Layfield was injured and suffered damages in an amount to be proven at trial.

8

9                    **Third Counterclaim- Declaratory Relief**

10                          **(Against Wellgen)**

11       155. Layfield incorporates by reference each of the foregoing allegations as though fully set

   forth herein.

12
       156. An actual and justiciable controversy now exists between Layfield and Wellgen
13
   concerning whether Wellgen has a valid and enforceable judgment against Layfield. Because
14
   Layfield was never served and because a determination was never made on the actual merits of
15
   Layfield's claims, it must be determined whether Layfield was present in Marina del Rey,
16
   California, at the residence of 118 Union Jack Mall, Marina Del Rey, California 90292 on the date
17
   and time claimed by Wellgen. Because Wellgen committed fraud in obtaining this judgment,
18
   Layfield seeks a judicial determination of this fact.

19

20                         **CROSS-CLAIMS**

21       Layfield alleges for his cross-complaint against Advocate Capital, Todd Wakefield, Joseph

22  M. Barrett, Gregory Allen Stuck, Christopher Tyler Webster, Jeffery Golden, Martin J. Brill, and

23  Richard Horner as follows:

24       157. Layfield incorporates by reference each of the foregoing allegations as though fully set

25  forth herein.

26       158.  Cross-Defendant Advocate Capital, Inc. ("Advocate") is a Tennessee corporation

27  engaged in the business of lending money to plaintiff law firms at high interest rates. Advocate knew

28  that Layfield did not abscond with millions of dollars for the purpose of fleeing the country.

159. Cross-Defendant Todd Wakefield ("Wakefield") is a citizen of the United States and a resident of Park City Utah. Wakefield was the former General Counsel and Director of Litigation for Layfield & Barrett (L&B), a member and Manager of Maximum Legal, LLC ("ML"), a 0.01% partner of MLC, the Manager of Maximum Legal Staffing ("MLST"), the Manager of Maximum Legal (Florida), PLLC, the Manager of Maximum Legal (Utah), LLC, and the Manager of Maximum Legal (Arizona), LLC. Wakefield no longer practices law. Wakefield knew that Layfield did not abscond with millions of dollars for the purpose of fleeing the country.

160. Cross-Defendant Joseph M. Barrett ("Barrett") is a citizen of the United States and resident of Redondo Beach, California. Barrett was a shareholder and director of L&B, a shareholder and director of Barrett Law, P.C., a member and manager of ML, and a supervising attorney and indirect principal of MLC pursuant to California State Bar Rule 1-100(B)(1)(a) and Rule 3.170 et. seq. Barrett is currently an attorney at Affeld Grivakes, LLP in Los Angeles whose caseload consists primarily of former L&B, ML and MLC clients. Barrett knew that Layfield did not abscond with millions of dollars for the purpose of fleeing the country.

161. Cross-Defendant Gregory Allen Stuck ("Stuck") is a citizen of the United States and resident of Los Angeles, California. Stuck is the son of a different Gregory Stuck who is a disbarred lawyer from Ohio and who currently works for Wilshire Law Firm. Stuck was the former Director of Prelitigation for L&B, was the Director of Prelitigation for ML and is now the principal of Stuck Law. Stuck Law's client base consists primarily of former L&B and ML clients.

162. Cross-Defendant Christopher Tyler Webster ("Webster") is a citizen of the United States and resident of Park City, Utah. Webster was the former Director of Marketing for L&B. Webster was set to become the Director of Marketing for ML,but was terminated for cause prior to that position taking effect. Webster stole sensitive computer data upon leaving his employ with L&B and later took actions to destroy and/or alter L&B data. Webster also assisted others in hacking into computer networks in violation of numerous federal and state criminal statutes.

163. Cross-Defendant Jeffery Golden is a citizen of the United States and resident of Orange County, California. Golden regularly conducts business on behalf of clients located in the State of Tennessee.

164. Cross-Defendant Martin J. Brill is a citizen of the United States and resident of Los

Angeles, California. Defendant Brill knew that Wakefield was not and could not have been the 100% owner of MLC and assisted Wakefield in furthering his fraudulent scheme to harm Layfield.

165. Cross-Defendant Richard Horner is a citizen of the United States and resident of Los Angeles, California.

166. The true names and capacities of the defendants named herein as John Does 1-50 are unknown to Layfield, who therefore sues them under these fictitious names. Layfield will amend the complaint to add their true names and capacities when they become known.

167. The coalition of firms and individuals who sought to profit from the financial difficulties being experienced by L&B became part of the growing "Destroy Layfield Enterprise," a RICO enterprise. The Destroy Layfield Enterprise had many participants, grew over time and included (i.) Joseph Barrett, Todd Wakefield, Gregory Stuck, Christopher Webster, Martin Brill, Jeffery Golden, Advocate Capital, Richard Horner and Does 1-50. These individuals and organizations embarked on a series of false and misleading statements, which included sworn statements, surrounding the operations, purpose, prospects, whereabouts, intentions, motivations and overall conduct of Layfield and his professional, business and personal operations. This pattern of false and misleading information was designed to create a false impression that Layfield had abandoned the law firm he founded (L&B), had ceased all operations at L&B, had abruptly ceased all operations at ML, had no ownership or affiliation with MLC, was acting in an evasive and secretive manner regarding his whereabouts, and had engaged in a scheme to steal millions of dollars from clients for the purpose of fleeing the country to avoid prosecution. All of these statements were false when made, were known to be false and were designed to inflict as much harm on Layfield as humanly possible while the participants profited from this wrongful activity. In addition to the false statements, these participants engaged in and/or assisted one another in concealing actual records which contradicted the false statements, destroying or altering vital records. The goal of this enterprise was to abscond with assets that were rightfully the property of L&B, ML, MLC and Layfield without paying fair compensation, destroy Layfield's ability to practice law, destroy Layfield business prospects, cause Layfield to be criminally prosecuted and seize all of Layfield's assets and put Layfield and his family in the streets. The participants in the enterprise coordinated their efforts, actively shared information with each other, prepared documents in conjunction with each other, obtained computer data, used the federal

mails in furtherance of their scheme, used the federal wires in furtherance of their scheme, illegally accessed protected computer and personal data and actively published false and misleading information in blatant disregard of the truth. This enterprise was successful in accomplishing its goals.

## First Cross-claim- Violation of 18 U.S.C. § 1962(C)
### (Layfield versus the "Destroy Layfield Enterprise")

168. Layfield incorporates by reference all preceding paragraphs, as if fully set forth herein.

169. Cross-Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

170. The Destroy Layfield Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Cross-Defendants, including their employees and agents; and (ii) unknown and unnamed co-conspirators as set forth. *Supra*. The Destroy Layfield Enterprise is an ongoing organization that functions as a continuing unit. The Destroy Layfield Enterprise was created and used as a tool to effectuate Cross-Defendants' pattern of racketeering activity.

171. The Destroy Layfield Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) inflicting economic, personal, professional, emotional and other harm on Layfield, (ii) to profit from the ultimate demise of Layfield and his business associations, and (iii) destroying, mutilating, or concealing records, documents or other evidence to prevent the use of such evidence to refute the false narrative being perpetrated by the Destroy Layfield Enterprise.

172. Cross-Defendants have conducted and participated in the affairs of the Destroy Layfield Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1) and 1961(5), which includes perjury, suborning perjury, economic espionage, theft of trade secrets and multiple instances of mail and wire fraud as described below.

173. The Destroy Layfield Enterprise engaged in and affected interstate commerce, because, *inter alia*, Layfield's business dealings and the Cross-Defendants engaged in business throughout the

United States, including but not limited to California, Utah, Arizona, Colorado, Florida, Tennessee, Delaware, New York, New Jersey, North Carolina, New Mexico and Nevada.

174. Cross-Defendants exerted control over the Destroy Layfield Enterprise, and Cross-Defendants participated in or aided and abetted in the operation or management of the affairs of the Destroy Layfield Enterpise.

175. Within the Destroy Layfield Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Destroy Layfield Enterprise used this common communication network for the purpose of enabling the participants to inflict further harm on Layfield.

176. Each participant in the Destroy Layfield Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships, financial ties, social media, and the continuing coordination of their activities. Through the Destroy Layfield Enterprise, the Cross-Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes.

177. The RICO Cross-Defendants used the mails and wires for the transmission, delivery, or shipment of the following by the RICO Cross-Defendants that were reasonable foreseeably caused to be sent as a result of Cross-Defendants' illegal scheme:

(a) Contracts between Wakefield, Barrett and Brill regarding the filing of a fraudulent bankruptcy petition;

(b) Contracts between Advocate and Golden regarding Layfield;

(c) Wires between Barrett, Wakefield and Brill regarding the means and methods of inflicting harm on Layfield;

(d) Payments between MLC, Wakefield, Barrett and Brill;

(e) Wires between Wakefield, Webster, Stuck, Barrett regarding the means and methods of inflicting harm on Layfield;

(f) Wires between Advocate and Golden regarding the means and methods of harming Layfield and falsifying a proof of service to engage in bankruptcy fraud;

(g) Emails between each and every participant regarding the false narrative regarding Layfield;

178. The RICO Cross-Defendants utilized the interstate and mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

179. The RICO Cross-Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities.

180. The RICO Cross-Defendants also communicated by U.S. Mail, by interstate facsimile, any by interstate electronic mail with various other affiliates, co-conspirators and other third-party entities in furtherance of the scheme.

181. The mail and wire transmissions described herein were made in furtherance of Cross-Defendants' scheme and common course of conduct to deceive the public, the courts and Layfield's clients and business associates about Layfield's alleged activities.

182. To achieve their common goals, the RICO Cross-Defendants hid from the public, the courts, clients and business associates the truth about the operation of Layfield's business activities, which included that even after Layfield temporarily relocated to Costa Rica, Layfield continued to perform legal services, continued to manage L&B's operations, continued to engaged professionals, continued to make payments to clients and vendors, continued to actively work cases and continued extraordinary efforts to get all clients and creditors fully compensated.

183. Cross-Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to cause Layfield to be perceived as a criminal, fraudsters and one who couldn't be trusted for any purpose.

184. The pattern of racketeering activity alleged herein are separate and distinct from each other. Cross-Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting, aiding or abetting and conspiring in the affairs of the Destroy Layfield Enterprise.

185. Layfield has been injured in this property and business by reason of these violations. Cross-Defendants interefered with Layfield's current and prospective contractual relations, because Layfield lost employment and employment opportunities, his freedom, as well as contractual and contractual opportunities, as a result of Cross-Defendants' conduct.

186. Had members of the Destroy Layfield Enterprise not been complicit and had they revealed instead of concealed the truth regarding Layfield's intentions regarding his ongoing business

1  prospects and his desire to ensure all of his creditors were compensated fully, Layfield would not
2  have been injured in the severe manner he was. Thus, Layfield's injuries were directly and
3  proximately caused by Cross-Defendants' racketeering activity, as described above.

4      187.  By virtue of these violations of 18 U.S.C § 1962(c), Cross-Defendants are liable to
5  Layfield for three times the damages Layfield has sustained, plus the cost of this suit, including
6  reasonable attorneys' fees.

**Second Cross-claim- Violation of 18 U.S.C. § 1962(D)**

**By Conspiring to Violate 18 U.S.C. § 1962(C)**

**(Layfield versus the Destroy Layfield Enterprise)**

11     188.  Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

12     189.  Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire
13  to violate any of the provisions of subsection (a), (b) or (c) of this section."

14     190.  Cross-Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. §
15  1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or
16  indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a
   pattern of racketeering activity.

17     191.  As demonstrated in detail above, Cross-Defendants' co-conspirators have engaged in
18  numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including
19  multiple instances of mail fraud, wire fraud obstruction of justice, economic espionage and theft of
20  trade secrets.

21     192.  The nature of the above-described Cross-Defendants' co-conspirators' acts in
22  furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of
23  an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c) but also were
24  aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering
25  activity. At all relevant times, all Cross-Defendants and all Cross-Defendants' co-conspirators were
26  aware of the essential nature and scope of the Destroy Layfield Enterprise and intended to participate
27  in it.

28     193.  As a direct and proximate result of Cross-Defendants' overt acts and predicate acts in

furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) but were also aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity. At all relevant times, all Cross-Defendants and Cross-Defendants' co-conspirators were aware of the essential nature and scope of the Destroy Layfield Enterprise and intended to participate in it.

194. As a direct and proximate result of Cross-Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Layfield has been and is continuing to be injured in his business or property, as set forth more fully above.

195. Cross-Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Cross-Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

### Third Cross-claim- Breach of Fiduciary Duty

### (Against Barrett & Wakefield)

196. Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

197. Barrett and Wakefield were at all times alleged herein Managers of ML, Members of ML and Members of MLC.

198. As members and managers of ML and MLC, Wakefield and Barrett owed fiduciary duties to Layfield, how was also a manager and member of ML and MLC.

199. Barrett was a shareholder, officer and director of L&B. Wakefield was an officer of L&B in his role as General counsel.

200. Wakefield acted as counsel to L&B, ML, MLC and Layfield in numerous instances.

201. Barrett acted as counsel to L&B, ML and MLC in numerous instances.

202. As members, managers and attorneys for ML and MLC, Barrett and Wakefield owed fiduciary duty to Layfield to act at all times with the utmost care, honesty, undivided loyalty, and fidelity in all their business dealings with Layfield.

203. As a shareholder, officer and director of L&B, Barrett owed fiduciary duty to Layfield to act at all times with the utmost care, honesty, undivided loyalty, and fidelity in all their business

1    dealings with Layfield.

2        204.  As counsel for L&B, ML MLC and Layfield, Barrett and Wakefield owed fiduciary

3    duty to Layfield to act at all times with the utmost care, honesty, undivided loyalty, and fidelity in all

4    their business dealings with Layfield.

5        205.  Wakefield and Barrett breached their fiduciary duties to Layfield by attempting to steal

6    the MLC entity from Layfield and ML without paying just compensation, engaging in a pattern of

7    racketeering activity as described above for the purpose of harming Layfield and by leading a

8    campaign of false and fraudulent information regarding Layfield and his business dealings.

9        206.  Wakefield and Barrett breached their fiduciary duties to Layfield by the acts of

     misfeasance and malfeasance as described herein.

10       207.  As a proximate result of Wakefield and Barrett's breach of fiduciary duty, Layfield has

11   been harmed as alleged in an amount to be proved at trial.

12

13                         **Fourth Cross-claim- Fraud**

14   **(Against Barrett, Wakefield, Brill, Golden, Advocate, Stuck, Horner and Does 1-50)**

15

16       208.  Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

17       209.  Barrett, Wakefield, Brill, Golden, Advocate and Stuck have suppressed and concealed

18   certain material facts for the purpose of harming Layfield.  They also engaged in a campaign of false

19   and misleading information as well as criminal acts for the purpose of effectuating their fraud scheme.

20       210.  In particular, Cross-Defendants devised a scheme to file a fictitious bankruptcy on

21   behalf of MLC, wrongfully claim ownership of MLC, force L&B into an involuntary bankruptcy,

22   cause all L&B clients and co-counsel and ML clients and co-counsel to terminate all relationships

23   with L&B and ML, cause a series of lawsuits to be filed against Layfield and obtain fraudulent

24   judgments, cause Layfield to come under investigation by law enforcement, cause Layfield's assets

25   to be frozen and seized, cause Layfield to become incarcerated, and prevent Layfield from being able

26   to assert affirmative claims against the Cross-Defendants by forcing Layfield into a fraudulent

27   involuntary bankruptcy.  The false statements made by these various Cross-Defendants, included but

28   was not limited to the following:

a. Barrett, Wakefield and Stuck stated that thye was unaware that Layfield was relocating to Costa Rica, was unaware of client complaints at L&B, that Layfield had abandoned his clients and L&B's operations, had absconded with millions of dollars, had fled the country and that none of them had any knowledge of any financial difficulties ongoing at L&B. Stuck told clients that L&B was "closed" and that Layfield was being disbarred even though Stuck had no actual knowledge at the time of any disciplinary proceedings.

b. Barrett stated that he was working in his individual capacity during the summer of 2017 as opposed to on behalf of ML, MLC or L&B for the sole purpose of improperly collected legal fees on behalf of former L&B clients.

c. Barrett, Wakefield and Brill stated that Wakefield was the 100% owner of MLC even though all of them knew that Wakefield was only a 0.01% owner.

d. Barrett, Wakefield and Brill made numerous false statements in bankruptcy filings relating to the operations of L&B, the location of L&B client funds, the status of the L&B IT infrastructure and the status of their purported access to data.

e. Golden, Advocate and Horner told the United States District Court that they had served Layfield in Marina del Rey on September 21, 2017 when they knew that Layfield was in Costa Rica. Golden and Advocate caused numerous individuals to file documents under penalty of perjury regarding the fictitious service of Layfield

f. Webster told numerous individuals that Layfield had absconded with millions of dollars in cash, that he supposedly withdrew from bank accounts in New York during November 2016 and fled to Bermuda to stash the phantom cash in secret bank accounts in Bermuda. Webster knew this information was false yet he continued to make these false statements to harm Layfield's business interests and Layfield personally.

g. Cross-Defendants engaged in a widespread pattern of making false statements to numerous parties for the sole purpose of depriving Layfield of his property rights.

h. Barrett and Wakefield concealed from Layfield that their true intention was to steal the MLC entity from ML, which was majority owned by Layfield and profit handsomely from their false statements. Among those false statements, Wakefield and Barrett claimed that Wakefield was the 100% owner of MLC when they both knew he was not.

1    i. Stuck and Webster concealed from Layfield that Stuck was illegally accessing the computer
2    networks and confidential client data of L&B, ML and MLC after Stuck and Webster's employment
3    was terminated. Stuck and Webster illegally accessed this confidential data for the purpose of
4    effectuating their own fraud scheme to tell clients that L&B, ML and MLC were going out of
5    business.

6    211. As a proximate result of Cross-Defendants intentional and fraudulent suppression of
7    true facts, Layfield has been harmed and has suffered damages, in an amount currently unascertained,
8    but according to proof at trial, but is at least in excess of $75,000.

9    212. The aforementioned conduct of Cross-Defendants constitutes fraud, oppression,
     misrepresentations, concealment, promises without the intent to perform, with the intent on part of
10   the Cross-Defendants of inducing reliance and thereby depriving Layfield of property and/or legal
11   rights or otherwise causing injury, and was despicable conduct that subjected Layfield to cruel and
12   unjust hardship in conscious disregard of Layfield's rights, so as to justify an award of exemplary
13   and punitive damages.

14                    **Fifth Cross-claim- 18 U.S.C. § 1030(A)**

15             **(Against Wakefield, Barrett, Webster, Stuck and Does 1-50)**

16

17   213. Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

18   214. Layfield's computers, ML's computer, L&B's computers and MLC's computers (the
19   "Subject Computers") are involved in interstate and foreign commerce and communication, and are
20   protected computers under 18 U.S.C. § 1030(e)(2).

21   215. On information and belief, Wakefield, Barrett, Webster and Stuck knowingly and
22   intentionally accessed the Subject Computers without authorization or in excess of authorization, and
23   thereby obtained and used valuable information from those computers in violation of 18 U.S.C. §
24   1030(a)(2)(C). Such information included, but was not limited to: private, attorney client privileged
25   communications, confidential medical information, confidential client lists, trade secrets, marketing
26   plans, financial forecasts and attorney client privileged communications between Layfield and his
27   attorneys. The information was used to advance the plan to harm Layfield, steal Layfield's clients
28   and contact clients of Layfield for the purpose of disrupting Layfield's relationships.

216. Upon information and belief, Cross-Defendants deleted certain information, intentionally caused damage without authorization, to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A).

217. Upon information and belief, Cross-Defendants intentionally accessed a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. § 1030(a)(5)(C), or recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(B).

218. Cross-Defendants caused loss to one or more persons during a one-year period aggregating well over $5,000 in value, and they also caused damage affecting ten or more protected computers during a one-year period.

219. Cross-Defendants and un-named co-conspirators caused damage and loss, including but not limited to the cost of investigating and responding to the unauthorized access and abuse of their computer networks, conducting damage assessments, restoring and replacing computers and data, programs, systems, or information, the loss of the value of Layfield's trade secrets, and the harm to Layfield's business as described above. Layfield seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g).

### Sixth Cross-claim- 18 U.S.C. § 2701-12

### (Against Wakefield, Barrett, Webster, Stuck and Does 1-50)

220. Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

221. Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

222. Cross-Defendants willfully and intentionally accessed without authorization a facility through which electronic communications service is provided, namely, the Subject Computers, including their email servers, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

223. AS a result of these willful and intentional violations, Layfield has suffered damages and, as provided for in 18 U.S.C. §2707, seeks an award of the greater of the actual damages suffered or the statutory damages, punitive damages, attorneys' fees and other costs of this action, and

1    appropriate equitable relief.

2

3    **Seventh Cross-claim- Intentional Infliction of Emotional Distress**

4    **(Against All Cross-Defendants)**

5

6    224.  Layfield incorporates by reference all preceding paragraphs as if fully set forth herein.

7    225.  The above-described conduct of all parties caused Layfield to suffer severe emotional

8    distress.

9    226.  The above-described conduct of all parties was outrageous.

10   227.  The Cross-Defendants intended to cause Layfield emotional distress or they acted with

11   reckless disregard of the probability that Layfield would suffer emotional distress, knowing that

12   Layfield would suffer as a result of their conduct.

13   228.  Cross-Defendants' conduct was a substantial factor in causing Layfield severe emotional

     distress.

14   229.  Layfield suffered an amount of damages to be proven at trial.

15

16   **PRAYER FOR RELIEF**

17   **WHEREFORE,** Defendant prays for judgment as follows:

18   **A.     On His Answer Against Wellgen**

19       1.  That Plaintiff takes nothing by way of this Complaint;

20       2.  That the Court dismiss with prejudice Plaintiff's Complaint and each purported cause of

21   action alleged therein;

22       3.  That judgment be entered against Plaintiff and in favor of Defendant;

23       4.  That the Court award Defendant the cost of suit and attorneys' fees (including time

24   Defendant has spent on this matter in pro se);

25   **B.     On His Counterclaims Against Wellgen**

26       5.  That judgment be entered in Layfield's favor and against Wellgen on all of Layfield's

27   claims.

28       6.  For a judicial declaration that Layfield was in Costa Rica on September 21, 2017 and

1    that Wellgen and its's agents falsely claimed otherwise.

2       7. For actual damages, punitive damages, attorneys' fee, and costs of suit herein.

3

4    **C.**      **On His Cross-Claims Against Advocate Capital, Todd Wakefield, Joseph Barrett,**

5    **Gregory Stuck, Martin Brill, Jeffery Golden and Christopher Tyler Webster and Does 1-50**

6       8. That judgment be entered in Layfield's favor against all Cross-Defendants on all

7    Layfield's claims.

8       9. That statutory damages be entered in Layfield's favor against all Cross-Defendants on all

9    Layfield's claims requiring statutory damages.

10       10. That treble damages be entered in Layfield's favor against all Cross-Defendants on all

11    of Layfield's RICO claims.

12       11. That actual damages, punitive damages, attorneys' fee and costs of suit be awarded.

      12. That any other relief this court deems appropriate be awarded.

13

14

15

16    Dated: October 15, 2018

17

18                           Philip Layfield in Pro Per and as Successor in
Interest to Maximum Legal Holdings, LLC and
Maximum Legal Services, LLC

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

1

2      Defendant, Counterclaim Plaintiff and Cross-Claim Plaintiff hereby demands trial by jury on all

3      counts herein.

4

5      Dated: October 16, 2018

6

                                                     Philip Layfield in Pro Per and as Successor in

7      Interest to Maximum Legal Holdings, LLC and
                                                     Maximum Legal Services, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Answer, Counterclaim and Cross-Claims has been furnished to the below individuals via the Court's electronic filing system and/or by depositing same in the United States Mail, postage prepaid, on October 16, 2018.

Roger G. Jones
Brandley Arant
1600 Division Street, Suite 700
P.O. Box 340025
Nashville, TN 37203

Todd D. Wakefield
P.O. Box 983056
Park City, Utah 84098

Joseph Barrett
Damion Robinson
c/o Affeld & Grivakes, LLP
2049 Century Park East, Suite 2460
Los Angeles, California 90067

Christine Layfield



RECEIVED
in Clerk's Office

OCT 1 8 2018

U.S. District Court
Middle District of TN

October 15, 2018

Nashville Clerk's Office
United States District Court
Middle District of Tennessee
801 Broadway, Room 800
Nashville, TN 37203

      RE:    Wellgen v. Maximum Legal et. al.  Case No. 3:18-cv-00275

Dear Filing Clerk:

Please find enclosed the following for filing:

    1.   Answer, Counterclaim and Cross-Claim

Sincerely,

Philip J. Layfield

**Philip J. Layfield**
**c/o Maximum Legal Holdings, LLC**
**8 The Green**
**Suite #6426**
**Dover, DE 19901**
**(302) 401-6804**

# PRIORITY
## ★ MAIL ★

📅 DATE OF DELIVERY SPECIFIED*

📶 USPS TRACKING™ INCLUDED*

$ INSURANCE INCLUDED*

🚚 PICKUP AVAILABLE

* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

FROM:

### Click-N-Ship® Label Record

**USPS TRACKING # / Insurance Number:**
**9405 8036 9930 0707 8123 26**

| | |
|---|---|
| Trans. #: 446450296 | Priority Mail® Postage: $6.70 |
| Print Date: 10/18/2018 | Insurance Fee $0.00 |
| Ship Date: 10/18/2018 | Total $6.70 |
| Expected Delivery Date: 10/19/2018 | |
| Insured Value: $50.00 | |

From: PHILIP J LAYFIELD
C/O MAXIMUM LEGAL HOLDINGS, LLC
8 THE GRN STE 6426
DOVER DE 19901-3618

To: NASHVILLE CLERK'S OFFICE
UNITED STATES DISTRICT COURT
801 BROADWAY
STE 800
NASHVILLE TN 37203-3869

* Retail Pricing Priority Mail rates apply. There is no fee for USPS Tracking® service
on Priority Mail service with use of this electronic rate shipping label. Refunds for
unused postage paid labels can be requested online 30 days from the print date.



**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE



P S 00001000014

EP14F July 2013
OD: 12.5 x 9.5

This envelope is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.